Opinion issued August 13, 2007 









Opinion issued August 13, 2007










 

 

 

 














 

     

 

 

 

 

 

In The

Court of Appeals

For The

First District of Texas

 




 
 
 
 
 
 
 
 
 
 
 
 
 
 
 


 



NO. 01-05-00132-CV

 




 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 


 



GEORGIA-PACIFIC CORPORATION, Appellant

 

V.

 

FRED STEPHENS AND BETTY STEPHENS, Appellees

 

 



On Appeal from the 23rd District Court

Brazoria County, Texas

Trial Court Cause No. 22045-1 BH02

 








 



O P I N I O N

 

          In this asbestos case,
Georgia-Pacific Corporation seeks reversal of a judgment on a jury verdict
against it and in favor of appellees, Fred and Betty Stephens.  The Stephenses
sued Georgia-Pacific and other defendants after Fred developed mesothelioma,
alleging that he contracted the disease in part as a result of his exposure to
Georgia-Pacific joint compound during the years he worked as a commercial
painter.  On appeal, Georgia-Pacific contends (1) the evidence is legally
insufficient to support the jury finding of causation, (2) the trial court
erred in excluding an affidavit from Fred detailing his exposure to asbestos
gloves manufactured by codefendant Guard-Line, (3) the evidence is legally and
factually insufficient to support the jury award of mental anguish damages, and
(4) the evidence is legally insufficient to support the jury finding of
malice.  In a cross-issue, the Stephenses contend that the trial court erred in
calculating prejudgment interest.  Following the Texas Supreme Court’s decision
in Borg-Warner Corporation v. Flores, we conclude that the expert
testimony presented in this case is legally insufficient to support the jury’s
causation finding.  See No. 05-0189, 2007 WL 1650574, at *4–5 (Tex. June 8, 2007).  We therefore reverse and render.

I. FACTS

          For over thirty years, Fred
was employed in occupations that exposed him to asbestos and
asbestos-containing materials.  Fred served in the Navy from 1944 to 1946. 
During his service, he was exposed to asbestos and asbestos-containing products,
including boilers, pipe covering, insulation, gaskets, packing, and pumps.  He
subsequently worked for the Washington State Bureau of Reclamation on the Grand
Coulee Dam, from 1946 to 1954, where he was further exposed to asbestos and
asbestos-containing products, including turbines, generators, insulation,
gaskets, and pumps.  

          After finishing work on the
dam, Fred became a commercial painter.  He worked for Finrow Painting from 1954
until 1977 and then started his own business, Stephens Painting.  Fred painted various
commercial buildings, including schools, universities, hospitals, paper mills,
saw mills, grocery stores, and automobile dealerships.  At each of these sites,
he was responsible for painting the entirety of the building, including the
exterior and interior walls, the boiler room and pipes, and any equipment
located within the building.  During these years, Fred was exposed to asbestos
and asbestos containing products.  

          Some of the buildings Fred
painted were new or were under renovation.  Before Fred and his crew began to
paint the interior walls in a new building or one under renovation, sheetrockers
and tapers applied joint compound to connect adjoining pieces of sheetrock. 
The joint compound usually came in a powdered form that the workers mixed with
water before applying it to the walls.  Once the compound dried, the
sheetrockers sanded it to smooth the walls in preparation for painting.  The
mixing and sanding processes created a great deal of dust, and Fred was often
present in the room while the sheetrockers performed their tasks.  Once the
sheetrockers finished sanding, Fred swept the dust from the walls and floor and
proceeded to paint.  Occasionally, Fred mixed and sanded joint compound himself.


          Bestwall
Company manufactured the joint compound at issue in this case.  Georgia-Pacific
acquired Bestwall via merger in 1965.  The Georgia-Pacific/Bestwall joint
compound contained between two and eight percent chrysotile asbestos. 
Georgia-Pacific began manufacturing an asbestos-free joint compound in 1977. 
As discussed further below, Fred and his coworkers from Finrow
Painting recalled seeing the Georgia-Pacific brand of joint compound, among
other brands, at some of their job sites.

          Asbestos exposure is a
commonly recognized factor that increases the risk of developing mesothelioma, a
form of lung cancer.  In January 2003, doctors diagnosed Fred with a right
pleural biphasic mesothelioma.  He died of the disease shortly after this
trial.  

II. PROCEDURAL HISTORY

          The Stephenses sued 106
named defendants and 100 John Doe defendants in Brazoria County, alleging,
among other things, negligence, gross negligence, and strict liability.  By the
time of trial, the Stephenses, who reside in Washington State, had settled their
claims with all but three defendants: Georgia-Pacific (a Georgia corporation), Kaiser-Gypsum (a Washington corporation), and Guard-Line (a Texas
corporation).  Kaiser-Gypsum settled after opening statements, leaving complete
diversity of citizenship.  Georgia-Pacific removed the case to federal court, alleging
that Guard-Line, the Texas defendant, was fraudulently joined because the
Stephenses had no evidence against it.  See 28 U.S.C. § 1441(b) (2000)
(prohibiting removal based on diversity jurisdiction when defendant is resident
of forum state).  Fred responded with an affidavit averring that he had
breathed the dust from Guard-Line’s asbestos gloves “repeatedly and
continuously throughout [his] career as a painter which spanned over thirty
years.”  After finding that Georgia-Pacific had failed to show fraudulent
joinder, the federal court remanded the case back to state court. 

          When trial resumed, Georgia-Pacific
moved to strike the Stephenses’ experts, contending that their opinions were
insufficiently reliable because they did not show that “Mr. Stephens’ exposures
to Georgia-Pacific’s joint compound increased his risk of developing
mesothelioma to at least twice the risk that he would have had otherwise if not
exposed to Georgia-Pacific compound.”  After conducting a Robinson
hearing,[1] the trial court overruled
Georgia-Pacific’s motion and allowed the experts to testify.  

          At the close of the
evidence, the court directed a verdict for Guard-Line.  The court then submitted
a jury charge inquiring about marketing defects and negligence as to the joint
compound sold by Georgia-Pacific, together with the products of ten settling defendants. 
The jury found six of the eleven defendants, including Georgia-Pacific, liable
for both a marketing defect and for negligence.  It apportioned responsibility
at twenty percent for Georgia-Pacific and sixteen percent for each of the other
five liable settling defendants.  The jury awarded Fred $1.5 million for past
and future physical pain and impairment and $1 million for past and future
mental anguish.  It awarded Betty $1 million for loss of consortium and
household services.  It also found that Georgia-Pacific acted with malice and
awarded $2.5 million in exemplary damages.

          After making appropriate
settlement credits and applying the punitive damages cap, the trial court
signed a final judgment against Georgia-Pacific for $1,903,878.  This appeal
followed.

III. CAUSATION ANALYSIS

          Georgia-Pacific contends that
the evidence is legally insufficient to support a finding of specific
causation.  Georgia-Pacific relies on the general rule that, in a products
liability case, the plaintiff must prove that the defendant’s product caused
his injury.  See Gaulding v. Celotex Corp., 772 S.W.2d 66, 68 (Tex. 1989).  Georgia-Pacific notes that the Stephenses do not know—and did not prove—which asbestos
product caused Fred’s mesothelioma or contributed to an increased risk of his
developing it; rather, they relied on expert testimony that any exposure to
asbestos contributes to cause mesothelioma.  Georgia-Pacific challenges this
expert testimony on the ground that it does not comport with the requirements
for expert testimony set forth by the Texas Supreme Court in Merrell Dow
Pharmaceuticals, Inc. v. Havner, and the general jurisprudence of the Texas
Supreme Court that requires that exposure to a defendant’s product be a
“substantial factor” in causing a plaintiff’s injury.  See 953 S.W.2d
706, 717 (Tex. 1997).

A.      Standard of Review

       The test for legal sufficiency is “whether the
evidence at trial would enable reasonable and fair-minded people to reach the
verdict under review.”  City of Keller v. Wilson, 168 S.W.3d 802, 827 (Tex. 2005).  In making this determination, we credit favorable evidence if a reasonable
fact-finder could, and disregard contrary evidence unless a reasonable
fact-finder could not.  Id.  So long as the evidence falls within the
zone of reasonable disagreement, we may not substitute our judgment for that of
the fact-finder.  Id. at 822.  The trier of fact is the sole judge of
the credibility of the witnesses and the weight to give their testimony.  Id. at 819.  Although we consider the evidence in the light most favorable to the
challenged findings, indulging every reasonable inference that supports them,
we may not disregard evidence that allows only one inference.  Id. at 822.

B.      Specific Causation in an
Asbestos Case

          1.       General versus
Specific Causation

          Causation in toxic tort cases is often
discussed in terms of general and specific causation.  See Havner,
953 S.W.2d at 714.  “General causation is whether a substance is capable of
causing a particular injury or condition in the general population, while
specific causation is whether a substance caused a particular individual’s
injury.”  Id.

          Georgia-Pacific does not mount a general
causation challenge.  That is, for the purposes of this appeal, Georgia-Pacific
does not dispute that inhalation of chrysotile asbestos fibers (the type of
fibers found in Georgia-Pacific joint compound) can lead to the development of
mesothelioma.  Rather, Georgia-Pacific asserts that the Stephenses produced no
evidence of specific causation.  Georgia-Pacific asserts that “[t]he plaintiffs
did not prove that Georgia-Pacific joint compound, or any comparable joint
compound, caused mesothelioma in Mr. Stephens.”

          2.       Competing Specific Causation
Standards 

          “A fundamental principle of
traditional products liability law is that the plaintiff must prove that the
defendants supplied the product which caused the injury.”  Gaulding, 772
S.W.2d at 68.  In Gaulding, the petitioners conceded that they were
unable to identify the specific manufacturer of an asbestos-containing board
that caused their mother’s mesothelioma.  Id. at 67.  Their father had
purchased the board at a salvage yard and had converted it into a vanity
cabinet for their mother.  Id.  Because the petitioners did not know who
had manufactured the board, they sued five companies that allegedly “‘dominated
the market of asbestos-containing wallboard’ at the time of [their mother]’s
exposure.”  Id. at 68.  The Texas Supreme Court rejected each of
the collective liability theories advanced by the petitioners, including the
concert of action, enterprise, alternative, and market share liability theories. 
 Id. at 68–71.  

The Stephenses do not ask that we adopt any of
the collective liability theories rejected by the Texas Supreme Court in Gaulding.
 Thus, the parties here agree that Texas law requires that a plaintiff must
prove that the defendant’s product specifically caused his asbestos-related
injury.  The parties disagree about the way in which a plaintiff can prove
specific causation in an asbestos case.   

          3.       Celotex Corp. v. Tate:
The “Any Exposure” Test

          Until June 2007, the Texas Supreme
Court had not considered specific causation standards in an asbestos case since
Gaulding, but a few of our sister courts had.  In Celotex Corp. v.
Tate, the Corpus Christi Court of Appeals recognized that an asbestos case
in which the plaintiff alleges that the products of several defendants caused
his injury presents a unique situation.  797 S.W.2d 197, 203–05 (Tex. App.—Corpus Christi 1990, writ dism’d by agr.).  In Tate, the plaintiff knew which
three defendants had supplied the raw asbestos to which he was exposed while
working at a wallboard and plaster plant for nearly thirty years.  Id. at 200, 204.  Tate’s problem was that none of his medical experts could determine which
particular exposure to asbestos dust had resulted in his mesothelioma.  Id. at 204.

          The Tate court devised the
following causation rule for multi-defendant asbestos cases: “If there was
sufficient evidence presented by appellees showing that [appellant] supplied any
of the asbestos to which Tate was exposed, then appellees have adequately met
their burden of proof.”  Id. (emphasis in original).  In
other words, evidence of any exposure to a defendant’s product, no
matter the amount, was legally sufficient evidence to support a causation
finding.  Id.  This causation standard presumes harm from
exposure to the product, with the burden of apportioning that harm then placed
among the defendant manufacturers.  See id.  The Corpus Christi court
reaffirmed the applicability of this asbestos causation principle in Borg-Warner
Corporation v. Flores.  See 153 S.W.3d 209, 213–14 (Tex. App.—Corpus
Christi 2004), rev’d, 2007 WL 1650574, at *8.  The Texarkana
Court of Appeals also adopted the Tate rule.  See Fibreboard Corp. v.
Pool, 813 S.W.2d 658, 691–92 (Tex. App.—Texarkana 1991, writ denied).

          4.       Lohrmann: The
Frequency-Regularity-Proximity Test

          But not all courts agreed that “any
exposure” sufficiently proved causation under Texas law.  One year after the
Corpus Christi Court of Appeals issued the Tate decision, the United
States Court of Appeals for the Fifth Circuit considered the asbestos causation
issue.  See Slaughter v. S. Talc Co., 949 F.2d 167, 170 (5th Cir. 1991). 
In Slaughter, the court applied “the most frequently used test for
causation in asbestos cases[:] the ‘frequency-regularity-proximity’ test,” first
announced by the United States Court of Appeals for the Fourth Circuit in Lohrmann
v. Pittsburgh Corning Corp., as the appropriate causation test under Texas
law.  Id. at 171; see also Lohrmann v. Pittsburgh Corning
Corp., 782 F.2d 1156, 1162–63 (4th Cir. 1986).  Under the
frequency-regularity-proximity test, a plaintiff must prove that, “more
probably than not, he actually breathed asbestos fibers originating in
defendants’ products.  This proof can be made by showing that plaintiff
frequently and regularly worked in proximity to defendants’ products such that
it is likely that plaintiffs inhaled defendants’ asbestos fibers.”  Slaughter,
949 F.2d at 171.

          The Dallas Court of Appeals considered
the frequency-regularity-proximity test in Keene Corp. v. Gardner.  See
837 S.W.2d 224, 227 (Tex. App.—Dallas 1992, writ denied).  The court declined
to expressly adopt the test because it found no case in which a Texas state court had applied the test.  Id.  The court nonetheless relied on it to find
that appellees had produced some evidence of causation.  Id. at 227–28. 


Several years later, the Fourteenth Court of
Appeals similarly considered the frequency-regularity-proximity test, in Click
v. Owens-Corning Fiberglass Corp.  See 899 S.W.2d 376, 378 (Tex.
App.—Houston [14th Dist.] 1995, no writ).  It noted that the Dallas
Court of Appeals had “applied” the test, while specifically declining to
“adopt” it.  Id.  The Fourteenth Court reversed a directed verdict
because the evidence showed that Click had insulated pipes for an extended
period of time; appellees’ products, which contained asbestos, were used by his
company for many years to insulate pipes; and appellees’ products were seen
near Click.  Id.  The court held that it was possible for a reasonable
jury to conclude that Click more probably than not inhaled asbestos fibers from
appellees’ products, which led to his mesothelioma.  Id.  Hence,
although our sister court did not expressly adopt the
frequency-regularity-proximity test, it effectively applied the test in
reaching its disposition.  Id.

5.                
Havner: Epidemiological
Studies and Specific Causation Requirements

 

          Meanwhile, in toxic tort cases not
involving asbestos, the Texas Supreme Court set forth guidelines for assessing
the adequacy of exposure in Merrell Dow Pharmaceuticals, Inc. v.
Havner.  See 953 S.W.2d at 714–15.  In Havner, the Texas Supreme
Court held that, in cases in which no direct evidence of specific causation
exists, plaintiffs may rely on studies showing an increased risk of their
particular injury resulting from exposure to the substance at issue to raise a
fact question on causation.  Id.  Specifically, the court held:

          In the absence of direct, scientifically reliable proof
of causation, claimants may attempt to demonstrate that exposure to the
substance at issue increases the risk of their particular injury [by relying on
epidemiological studies].  The finder of fact is asked to infer that because
the risk is demonstrably greater in the general population due to exposure to
the substance, the claimant’s injury was more likely than not caused by that
substance.  Such a theory concedes that science cannot tell us what caused a
particular plaintiff’s injury.  It is based on a policy determination that when
the incidence of a disease or injury is sufficiently elevated due to exposure
to a substance, someone who was exposed to that substance and exhibits the disease
or injury can raise a fact question on causation.

 

Id. at 715.

 

          Use of an increased risk to prove
causation comes with an important caveat:  when a plaintiff relies on
epidemiological studies to prove specific causation, he must show that he is
“similar” to the individuals in the study.  Id. at 720.  This includes:

proof that the injured person was exposed to the same substance,
that the exposure or dose levels were comparable to or greater than those in
the studies, that the exposure occurred before the onset of injury, and that
the timing of the onset of injury was consistent with that experienced by those
in the study.  Further, if there are other plausible causes of the injury or
condition that could be negated, the plaintiff must offer evidence excluding
those causes with reasonable certainty.

 

Id. (citation omitted); see also Coastal Tankships, U.S.A., Inc.
v. Anderson, 87 S.W.3d 591, 602 n.21 (Tex. App.—Houston [1st Dist.] 2002,
pet. denied) (“The supreme court recognizes that it is possible that a
toxic-tort plaintiff may not be able to find reliable direct evidence of
specific causation.  A plaintiff in such a situation may be able to prove
specific causation circumstantially by taking general-causation evidence, such
as epidemiological studies, and showing he is similar to the studies’
subjects.”  (citation omitted)).  

          Thus, in the years since Gaulding,
Texas courts developed different tests for specific causation—each an
effort to strike an appropriate balance between the competing concerns in an
asbestos case—namely, on the one hand, the difficulties encountered by
plaintiffs with asbestos-related diseases, who were exposed to multiple
asbestos-containing products, in proving which products caused their injury,
and, on the other, “the concept deeply imbedded in our jurisprudence that a
defendant cannot be found liable for an injury unless the preponderance of the
evidence supports cause in fact.”  Havner, 953 S.W.2d at 718; see
also Jackson v. Anchor Packing Co., 994 F.2d 1295, 1301 (8th Cir. 1993)
(“Courts across this country have struggled with the appropriate quantum of
proof that asbestos plaintiffs should be required to produce in order to submit
the issue of causation to a jury.  The courts have recognized that, given the
nature of asbestos exposure in large industrial settings and the long latency
periods for asbestos-related diseases, plaintiffs (especially bystanders) face
a formidable task in showing, after many intervening years, exposure to a
particular defendant’s asbestos product and that exposure’s causation of the
plaintiff’s injuries.  On the other hand, the courts have also recognized the
countervailing interest that states and defendants have in retaining the
longstanding requirement of proximate cause in tort law.”  (citations omitted)).[2]

6.       The Texas Supreme Court
Settles the Issue: Borg-Warner v. Flores

It is within this framework that the Texas
Supreme Court decided Borg-Warner, rejecting the “any exposure”
test for specific causation and adopting a Lohrmann/Havner substantial-factor
causation standard.  See 2007 WL 1650574, at *4–5.

The asbestos containing product in Borg-Warner
was brake pads.  Id. at *1.  Flores was a retired brake mechanic who
developed asbestosis.  Id.  During his thirty-five year career, Flores used Borg-Warner brake pads on five to seven of the roughly twenty brake jobs he
performed per week.  Id.  The Borg-Warner brake pads contained seven to
twenty-eight percent asbestos fibers.  Id.  Grinding the brake pads
generated clouds of dust that Flores inhaled while working in an eight by ten-foot
room.  Id.

Flores’s experts opined that Borg-Warner brake
pads caused Flores’s asbestosis due to the asbestos dust he inhaled while
grinding the brake pads.  Id.  First, Flores’s pulmonologist noted that Flores’s lungs showed scarring associated with asbestos fibers.  Id.  Second, Flores’s expert as to exposure level noted that research involving the brake industry showed
that “levels of exposure [to asbestos fibers] . . . could be significant,” and
pointed to OSHA studies and warnings regarding increased levels of asbestos
exposure among brake mechanics.  Id. at *2.  Yet, Flores’s experts
conceded that “everyone is exposed to asbestos in the ambient air” and that
they did not research Borg-Warner’s brake pads in particular to determine
whether grinding them resulted in an increased risk of exposure to asbestos.  Id. at *1–2.  The jury found for Flores, apportioning thirty-seven percent of the
liability for his asbestos-related injury to Borg-Warner.  Id. at *3.  The Corpus Christi Court of Appeals, applying the “any exposure” test
announced in Tate, affirmed.  Id.

The Texas Supreme Court reversed and rendered,
concluding that Flores’s expert testimony was legally insufficient proof of
substantial-factor causation.  Id. at *8.  First, the Texas Supreme
Court adopted the Lohrmann “frequency, regularity, proximity” standard
but noted that, at its inception, the Lohrmann court’s analysis went further
than this tripartite test: the essence of Lohrmann is that the exposure must
“be a ‘substantial factor’ in causing the disease.”  Id. at *4.  Thus, a
plaintiff must not only show that he was exposed to the asbestos-containing
product on a regular basis, but also that such exposure was in sufficient
amounts so as to increase his risk of developing an asbestos-related disease.  Id. at *4–5.  As the court observed, toxicologists agree that it is the dose of a
potentially toxic substance that makes it poison.  Id. at *5.  As
asbestosis is a dose-responsive disease, “so that the more one is exposed, the
more likely the disease is to occur,” the record must contain evidence as to
the quantity of respirable asbestos for the jury to evaluate.  Id.  Relying on its Havner decision, the court reaffirmed the principle that
“epidemiological studies are without evidentiary significance if the injured
person cannot show that ‘the exposure or dose levels were comparable to or
greater than those in the studies.’”  Id. (quoting Havner,
953 S.W.2d at 720–21).

The court thus concluded that the Lohrmann
frequency-regularity-proximity test is necessary to prove causation, but alone
is not sufficient.  Id. at *4–5.  To prove substantial-factor causation,
a plaintiff must show both frequent, regular, and proximate exposure to the
product and reasonable quantitative evidence that such exposure
increased the risk of developing the asbestos-related injury.  Id. at *4–7.  It is not adequate to simply establish that “some” exposure occurred.  Id. at *8.   

B.      Application of the Borg-Warner
Specific Causation Analysis

With the principles set forth in Borg-Warner in
mind, we turn now to an analysis of the lay and expert testimony that the
Stephenses presented at trial regarding the Georgia-Pacific joint compound as a
cause of Fred’s mesothelioma.

          1.       The Lay Testimony

          We first clarify the relevant
timeframe for our analysis.  Georgia-Pacific began manufacturing an
asbestos-free joint compound in 1977.  Thus, the relevant timeframe for our
analysis is 1965, the year Georgia-Pacific acquired Bestwall, through 1977, the
year Fred stopped working as a painter, and Georgia-Pacific removed all
asbestos from its joint compound.

          Fred testified live at trial and
through a videotaped deposition played for the jury.  During his deposition, Fred
initially testified that he did not think he had personally worked with any
Georgia-Pacific products, and that the only Georgia-Pacific product he ever
worked around was sheetrock.  Unlike Georgia-Pacific joint compound,
Georgia-Pacific sheetrock did not contain asbestos.  Later in the deposition,
however, Fred clarified that he personally used Georgia-Pacific joint compound
during the 1960s and 1970s: “Well, I have used that [Georgia-Pacific joint
compound] quite a bit on jobs.  In fact, I’ve gone into some small jobs and
done the taping [applying joint compound] myself in a
room. . . .  I never was classified as a taper myself,
but I’ve done quite a bit of taping.”  He also testified that after other
workers applied and sanded Georgia-Pacific joint compound, he and his crew cleaned
up by sweeping the dust off the floor with a broom, which “put dust up into the
air where you could see it.”  Moreover, during his live trial testimony, Fred
responded in the affirmative to counsel’s question, “[D]o you remember seeing
Georgia-Pacific joint compound on a substantial number of jobs you worked
on?”    

Several of Fred’s coworkers also testified
regarding Fred’s exposure to joint compound.  Roger Lenius testified by
videotaped deposition that he worked with Fred from 1968 until 1977.  He stated
that fifty to seventy-five percent of their job duties involved painting new
construction and being around sheetrock work.  When asked which joint compound
products he observed during those years, he testified as follows: “Kaiser
Gypsum.  There was a Best Wall or Better Wall.  I think later they were using—it
was Georgia-Pacific.  And then there was Flintkote and Gold Bond, but—these
were some of the ones that seemed to be used more prevalently than others.” 
When asked whether he noticed any particular brand more than another, he
responded that “the jobs that seemed to have more of the particular products
would be Kaiser Gypsum and Gold Bond.  I noticed a lot of those.  Flintkote was
a fair amount . . . .” 

Lenius testified that he and Fred were often in
the same room, probably twenty to thirty feet away from the workers who mixed
the dry joint compound with water.  He testified that the mixing process was
dusty, as was the sanding process: “When they sand a wall, of course, there’s a
big cloud of dust and a lot of times it drifts. . . .  And then, of course, it
falls to the ground, lays on the wall.  So there’s . . . quite a bit of dust
everywhere.”  Lenius stated that he and Fred were “generally pretty close” to
the sanders because they painted “right behind” them.  When they spray painted,
they stood a maximum of six feet away from the wall, and the pressure from the spray
paint would reintroduce the asbestos dust into the air—in fact, it would “raise
clouds of dust.”  Lenius stated that he and Fred did “a little bit of taping
but not very much.  Very little.”

Mack Stephens, Fred’s brother, worked with Fred
at Finrow Painting from 1964 until 1977.  He testified via videotape that
twenty percent of their jobs involved painting pipes, one-third involved
painting the outside of buildings, fifteen to twenty percent involved painting
concrete walls, twenty percent involved painting equipment, and the remainder
(seven to twelve percent) involved painting interior walls.  He further
testified that seventy percent of those jobs involved sheetrock work.  He
recalled the following brands of joint compound at their job sites: Georgia-Pacific
Ready-mix, Georgia-Pacific dry powder, Flintkote patching, Kelly Moore patching,
and Bestwall.  Mack did not personally observe Fred using any Georgia-Pacific
dry powder product.  

Mack testified that he and Fred were often in
the same room with the workers who mixed and sanded the joint compound.  Both
of these processes caused dust to fly everywhere.  Before Fred and his crew
could paint, Fred cleaned the floor by sweeping the dust with a broom.  It
would be “so dusty you couldn’t hardly see the room.”  Mack also testified
that, although it was not a regular part of their job to do sheetrock patch
work, he observed Fred personally apply and sand joint compound while at
Finrow.  He recalled seeing Fred sand the joint compound more than once, but
could not recall how often.  

Michael Stephens, Fred’s son, worked at Finrow
Painting during the summers of 1968 through 1970, full-time starting in 1971
until the end of 1972, and then again from 1975 until 1977.  During the summers
of 1964 through 1968, Michael visited Fred at job sites a couple of times each
week for a few hours.  Michael recalled seeing the following joint compounds at
job sites: “I can remember Bestwall, I can remember Flintkote.  Those two, I
can remember them in the dry.  I can remember Georgia-Pacific, I can remember
Paco.  There’s some others I can remember, like Durabond, USB.  Those are the
ones I can remember.”  Michael testified that his father personally used Bestwall
joint compound at a Safeway job site.  Specifically, Fred mixed, applied, and
sanded the Bestwall compound and breathed the resulting dust.  Bestwall was the
product that the crew carried in their vehicle, so they used it for patch work
at other job sites, as well.  

Michael also testified that Fred and his crew
were often in the same areas where sheetrock work was being done.  They were
around the workers who mixed and sanded the joint compound, and there would be
dust in the air and on their persons from these processes.  Fred cleaned the
dust with a broom before spray painting.  Both the cleaning and painting
processes were dusty, as well.  

2.       The Expert Testimony

          The Stephenses called Jerry Lauderdale,
an industrial hygienist, Samual Hammar, M.D., a pathologist, and Alice Boylan,
M.D., a board-certified specialist in pulmonary disease, internal medicine, and
critical care, as expert witnesses on the causation issue.  Lauderdale opined,
“with respect to Georgia-Pacific joint compounds . . . [Fred’s] exposures were
at a level and of the type that are known by industrial hygienists to
contribute to the development of asbestos-related disease.”  He based his
opinion on a review of the deposition testimony of the lay witnesses, Fred’s
medical records, and literature relating to asbestos exposure.  The literature
upon which Lauderdale relied, as discussed in greater detail below, detected asbestos
fibers in excess of OSHA’s permissible exposure limits during joint compound
mixing and sanding operations.[3]  Lauderdale thus concluded, “it is possible to
say . . . that [Fred] would have from time to time been exposed to
concentrations above permissible exposure limits . . . .”  Lauderdale conceded,
however, that he could not “come up with a range of likely doses that Mr.
Stephens would have had to joint compound asbestos.”  With respect to
estimating dosage, Lauderdale testified, “It is my opinion that in a scientific
sense, I don’t believe that it can be done due to the fact there is not enough
information about [Fred’s] exposures; and it would be involving more guesswork
than science to come up with estimates or guesses for those type of numbers.”  Nor
could Lauderdale estimate the amount of time Fred was exposed to joint compound
generated asbestos dust in excess of OSHA permissible levels.  

          Lauderdale did not testify as to the
minimum level of exposure to asbestos dust from joint compound that could lead
to an increased risk of mesothelioma.  Instead, he observed that
“asbestos-related diseases are based on cumulative exposures and there is no
way to separate out what exposure, in fact, causes development of the
disease.”  It was Lauderdale’s opinion “that every exposure does contribute to
the development of—potential to develop mesothelioma.”

          Dr. Hammar opined that chrysotile
asbestos, the kind found in the Georgia-Pacific joint compound, “cause[s]
dose-related asbestos disease, which means that you can see cases of all types
caused by chrysotile asbestos at different doses in different individuals.”  He
further opined that the level of exposure it takes to cause mesothelioma “could
be any level above what is considered to be background, which, from my
definition, would be anything greater than .1 fiber cc years.”  In sum, he
stated: “I’m going to express an opinion that each and every exposure that an
individual has in a bystander occupational setting causes their mesothelioma.” 
Like Lauderdale, Dr. Hammar relied upon various studies concerning asbestos
exposure and asbestos-related disease as the foundation for his opinion.  Dr.
Hammar also testified that mesothelioma is a dose-responsive disease, and that
a threshold exists “above which you may be at risk, below which you may not be
at risk” for developing the disease.

          Dr. Boylan testified that Fred’s mesothelioma
developed as a result of asbestos exposure, but had no information about the
particular asbestos-containing products to which Fred was exposed.  She did not
express an opinion “as to which of those specific products . . . actually
caused his disease.”  Dr. Boylan testified that people who live in a normal
urban environment will have asbestos fibers in their lungs as a result of breathing
asbestos in the air.  In her opinion, mesothelioma, like other asbestos
diseases, is a dose-responsive disease—the lower one’s exposure to asbestos,
the less likely one is to develop mesothelioma.  She could not offer an opinion
as to the level of exposure that would be low enough such that the exposure
could not be considered a cause of mesothelioma in an individual.  Similar to
Dr. Hammar, Dr. Boylan observed that “our understanding of the development of
cancer as it stands today is that all exposures to a carcinogen contribute to
the development of a malignancy, and you can’t say just one because it isn’t
just a one-hit injury that will cause cancer.  You have to have multiple
genetic alterations to lead to a malignant cell, so I would say all [exposures]
do.”

          Georgia-Pacific objected that the
literature relied upon by Lauderdale and Hammar does not support an “any
exposure” link between Georgia Pacific’s asbestos-containing joint compound and
mesothelioma.  Thus, we examine the literature presented in connection with
this trial.[4]

a.       Quantitative Evidence
of Increased Risk 

The Stephenses’ experts relied on numerous studies
showing that chrysotile asbestos is capable of causing mesothelioma generally,
thus providing some evidence of general causation.  For example, Dr. Hammar
cited one study that concluded as follows:

In contrast to amphibole forms of asbestos, chrysotile asbestos is
often claimed to be only a minor cause of malignant pleural mesothelioma . . .
.  Reported data[, however,] do[es] not support widely quoted views regarding
the relative inertness of chrysotile fibers in mesothelioma causation.  In
fact, examination of all pertinent studies makes it clear that chrysotile
asbestos is similar in potency to amphibole asbestos.  Since asbestos is the
major cause of mesothelioma, and chrysotile constitutes 95% of all asbestos use
world wide, it can be concluded that chrysotile asbestos is the main cause of
pleural mesothelioma in humans.

 

In another study, Dr. Yasunosuke Suzuki examined
the lung and mesothelial tissues of 151 individuals diagnosed with mesothelioma
and found that in sixty-eight percent of the cases, the mesothelial tissue
contained only chrysotile fibers—that is, there was a complete absence of amphibole
fibers.  This observation led Dr. Suzuki to conclude that “chrysotile fibers
[a]re capable of inducing human malignant mesothelioma.”  Georgia-Pacific did
not call any expert witnesses, or rely on any studies reaching the opposite
conclusion.

To support their claim of specific causation, the
Stephenses’ experts relied on four studies addressing occupational exposure to
joint compound among tapers and sheetrock workers.  Three of these studies
measured the average levels of airborne asbestos fibers from joint compound
products to which sheetrock workers are exposed on a daily basis.  For example,
one study found that the mean asbestos fiber concentration during pole sanding,
which typically consumes ten to fifteen percent of a worker’s day, was ten
fibers per cubic centimeter.[5]  The same study found that a worker standing
eight feet away from the individual doing the pole sanding would be exposed to
8.6 fibers per cubic centimeter on average, while a worker standing twenty-five
feet away would be exposed to 4.8 fibers per cubic centimeter.  The study also
found that a worker mixing dry joint compound, which typically takes sixty to
ninety seconds, would be exposed to 47.2 fibers per cubic centimeter on
average.  Someone standing ten to twenty feet away would be exposed to 5.8
fibers per cubic centimeter, while someone standing sixteen to thirty-five feet
away would be exposed to 2.6 fibers per cubic centimeter.  Finally, the study
found that, fifteen minutes after a worker finished sweeping dust from joint
compound off the floor, he would be exposed to 41.4 fibers per cubic centimeter
on average.  The average exposure decreased to 26.4 fibers per cubic centimeter
thirty-five minutes after sweeping.  The study authors noted that many of these
exposures exceeded the then-existing OSHA “threshold limit value” of five
fibers per cubic centimeter.[6]

A second study found similar, but generally
lower, mean asbestos fiber concentrations.  For instance, it found that a
worker mixing dry joint compound would be exposed to 11.2 fibers per cubic
centimeter on average.  An individual pole sanding would be exposed to 4.6
fibers per cubic centimeter, while an individual hand sanding would be exposed
to 11.5 fibers per cubic centimeter.  A worker sweeping would be exposed to
19.6 fibers per cubic centimeter.  The third study reached similar conclusions. 
These three exposure studies, however, dealt solely with potential exposures
during the mixing and sanding processes—they did not attempt to correlate the
exposures to any incidence of mesothelioma or asbestos-related disease among
the study subjects.

While the fourth study investigates mesothelioma
among workers exposed to asbestos, the authors did not measure exposure levels—rather,
they undertook a mortality analysis involving 12,873 deceased members of the
Operative Plasterers’ and Cement Masons’ International Association, a union
composed of plasterers, cement masons, and shophands.  The study described
plasterers’ job duties as follows:

Plasterers, in general, are responsible for all interior and
exterior plastering of drywall, cement, stucco, and stone imitation as well as
the taping[7] and pointing of all joints, nail holes and bruises on wallboard
or drywall.  Plasterers are also responsible for the preparation, installation,
and repair of all interior and exterior insulation systems, and the
fireproofing of steel beams and columns.  Approximately 10% of the plasterers’
duties involve insulation work . . . .

 

The study thus noted that plasterers are exposed to asbestos
from a variety of sources, including spray insulation, plastering, taping,
asbestos removal during demolition projects, and fireproofing mixture.  Plasterers comprised about one-third of the study population.

The authors conducted a proportionate mortality
ratio (“PMR”) analysis by comparing the number of deaths in the study
population attributable to a certain disease with the number of deaths expected
from that disease.  For example, there were 1,157 observed deaths from diseases
of the respiratory system generally, compared with 1,155 expected deaths,
leading to a PMR of 100.  For asbestosis specifically, there were fifteen
observed deaths, compared with only two expected, leading to a PMR of 693.

With respect to mesothelioma, the study
concluded as follows: “Mesothelioma, a relatively rare cancer death, was observed for four
members and the risk was elevated, PMR=188, but not statistically significant.” 
The authors later explained, however, that mesothelioma is frequently
misdiagnosed.  Consequently, the authors “manually reviewed all hard copy death
certificates in [thei]r possession (N=9,449) to obtain a more accurate
assessment of mesothelioma-related deaths in this cohort.  [They] identified 40
mesothelioma deaths; even though only one-third of [the] cohort were
plasterers, 50% of those who died of mesothelioma worked in this trade.” 

The study’s ultimate conclusion is
that the PMR for mesothelioma resulting from the cohort’s exposure to a variety
of asbestos-containing products is 188 (which we assume is synonymous with a
relative risk of 1.88),[8] but the study authors
observed that such an increase is not statistically significant.[9] 
And, although the study authors manually reviewed 9,449 death certificates and identified
thirty-six additional cases of mesothelioma, they did not calculate a new PMR
(i.e., relative risk) using this revised data or discuss its statistical
significance.[10]  They noted, however,
that “deaths [due to mesothelioma] are considered to be quite rare in the
general population.”  

          b.       Evidence of
Frequent-Regular-Proximate Contact 

          The Stephenses’ expert witnesses were
unable to estimate Fred’s exposure to Georgia-Pacific joint compound.  For
example, Jerry Lauderdale, the Stephenses’ industrial hygiene expert, testified
that Fred “was exposed to joint compounds, including Georgia-Pacific, on
numerous occasions.  As far as how much, I can’t give you a quantitative
estimate of how much he was exposed to. . . .  It’s not scientifically possible
to come up with a meaningful estimate of what that was.”  In fact, he conceded
that “it would be a guess rather than a scientific exercise” to determine “how
many times [Fred] was actually exposed to joint compound.”

Fred and his crew painted interior walls about
seven to twelve percent of the time, and other workers were doing sheetrock
work on about fifty to seventy-five percent of these jobs.  They worked in
close proximity to the sheetrock workers, who mixed and sanded joint compound,
both of which were dusty processes.  Before Fred and his crew could paint, they
had to sweep dust off the floor.  Moreover, the spray painting process itself
stirred up asbestos dust.  The record does not reveal, however, how frequently
this dust came from Georgia-Pacific’s joint compound, as opposed to one of the
other joint compound products Fred’s coworkers recalled seeing on their job
sites.  Fred’s coworkers recalled seeing ten different joint compound products:
Kaiser Gypsum, Bestwall, Flintkote, Gold Bond, Georgia-Pacific Ready-mix,
Georgia-Pacific dry powder, Kelly Moore patching, Paco, Durabond, and USB. 
Lenius testified that Kaiser Gypsum, Gold Bond, and Flintkote were used most
frequently.  

          In this record, there is no evidence
concerning the percentage of Georgia-Pacific joint compound used in comparison
to the quantity of other products used on Fred’s job sites, nor any
quantitative estimate of the number of times Georgia-Pacific joint compound was
used on Fred’s job sites.  On the other hand, there is evidence that three
other joint compounds were used more frequently than Georgia-Pacific’s
product.  Thus, although there was evidence that Fred was exposed to
asbestos-containing joint compound generally, there was no quantitative evidence
presented upon which Fred’s experts could rely to determine that he was exposed
to Georgia-Pacific’s product in sufficient quantities to have increased his
risk of developing mesothelioma.  See Borg-Warner, 2007 WL 1650574, at
*6 (“[A]bsent any evidence of dose, the jury could not evaluate the quantity of
respirable asbestos to which Flores might have been exposed or whether those
amounts were sufficient to cause asbestosis.  Nor did Flores introduce evidence
regarding what percentage of that indeterminate amount may have originated in
Borg-Warner products.”).

Other courts that have considered similar
factual scenarios have reached the same conclusion.  For example, the Eastland
Court of Appeals recently decided a case in which a brake worker had inhaled
asbestos dust from installing the brake products of six different manufacturers. 
Vaughn v. Ford Motor Co., 91 S.W.3d 387, 393 (Tex. App.—Eastland 2002,
pet. denied).  When Vaughn was asked whether he had used the various products
equally, one more than another, or one less than another, he replied that he
did not know.  Id.  The court, applying Illinois law regarding the
frequency-regularity-proximity test, concluded that, “[a]lthough there was
evidence from which a jury could have found that Vaughn’s exposure to
asbestos-containing brake products was a cause of his [mesothelioma] and
evidence that each exposure contributed to his disease, there was no evidence
from which a jury could have found that Vaughn was frequently exposed to any
particular defendant’s brake product.”  Id. at 392, 394.

Likewise, the United States Court of Appeals for
the Eighth Circuit decided a case in which several witnesses testified that
they had either seen or installed Owens-Corning Kaylo insulation at a tire
plant.  See Jackson, 994 F.2d at 1304.  The evidence indicated
that numerous other insulation products were also in use at the plant.  See
id. at 1299.  The court found that the plaintiffs had failed to meet the
frequency-regularity-proximity test, stating as follows:

With respect to the bystander plaintiffs, we find that the
evidence . . . is insufficient to support a jury finding that Owens-Corning’s
products were more likely than not a proximate cause of the plaintiffs’
injuries.  The plaintiffs’ witnesses have not stated how much Kaylo insulation
was used at the Mohawk plant, how often it was used, and where in the plant it
was used.  They have not given an estimate as to the amount of Kaylo used in
relation to the other insulation products installed in the plant.  They have,
therefore, failed to show the frequency and regularity of the use of Kaylo
insulation.

 

Id. at 1305.

Other products at issue in the case were gaskets
and packing materials manufactured by a company called Chesterton.  Id. at 1307.  With respect to a particular plaintiff’s frequency and regularity of
exposure, the Eighth Circuit observed as follows:

Carr testified that he had worked with gaskets and packing “many
times” during his years as a mechanic.  Thus, it appears at first glance that
Carr has satisfied the “frequency, regularity and proximity” test.  Carr’s case
has a missing link, however.  Although Carr said that he had used gaskets and
packing many times, the record contains no evidence that he used Chesterton
gaskets and packing many times.  We have no way of knowing whether Carr
selected Chesterton products for two jobs or two hundred jobs.

 

Id. at 1308; compare Robertson v. Allied Signal, Inc., 914
F.2d 360, 378 (3d Cir. 1990) (frequency-regularity-proximity test not met where, although
several witnesses were able to place defendant’s asbestos-containing product in
plant, no witness was able to say how much of product was used and how many
times it was used in given area), and Lohrmann, 782 F.2d at 1163 (exposure
to asbestos-containing pipe covering on ten to fifteen occasions of between one
and eight hours duration insufficient to satisfy frequency-regularity-proximity
test), with Rotondo v. Keene Corp., 956 F.2d 436, 442 (3d Cir. 1992) (frequency-regularity-proximity
test met where evidence showed that plaintiff worked in boiler room at least
two days per week for at least three to four months, and pipecoverers used
defendant’s asbestos-containing product in boiler room fifty percent of time), and
Goss v. Am. Cyanamid, Co., 650 A.2d 1001, 1006 (N.J. Super. Ct. App. Div.
1994) (frequency-regularity-proximity test met where plaintiff testified that
“most” asbestos pipe covering he used was manufactured by defendant, and
coworker testified that he used defendant’s pipe covering approximately ninety
percent of time and installed it in areas where plaintiff regularly worked).  But
cf. Owens-Corning Fiberglas Corp. v. Garrett, 682 A.2d 1143, 1156–57 (Md.
1996) (holding that frequency-regularity-proximity test was satisfied by
coworkers’ general testimony that they used variety of asbestos-containing
products at plant, including defendant’s product, and their testimony was
corroborated by invoices showing purchase of defendant’s product).

3.       Legal Sufficiency of the
Evidence Presented

          Borg-Warner requires that, for a plaintiff to prove specific
causation by relying on epidemiological studies showing an increased risk of
developing mesothelioma, he must show that the frequency and regularity of his
exposure to the asbestos-containing product is comparable to or greater than
that of the individuals in the studies upon which he relies.  See 2007
WL 1650574, at *5.  As discussed above, the evidence of Fred’s exposure to
Georgia-Pacific’s joint compound is legally problematic because it lacks the
quantitative element that Lohrmann and Borg-Warner require.  See
id. at *6.  Without quantifying Fred’s exposure to Georgia-Pacific joint
compound, the Stephenses’ experts inferred causation by opining that every
exposure to an asbestos-containing product “contributes to cause” mesothelioma. 
That is, the experts posited that all asbestos fibers cause mesothelioma
because all asbestos fibers have the ability to cause cancer-inducing mutations
in cells and it is not possible to pinpoint which particular fibers actually
caused the mutations.  Dr. Hammar summarized the theory as follows: “I think
you would have to say that . . . any exposure that [Fred] had to asbestos from
when he first started working up until, say, 1986, is causative of his
mesothelioma.”  

The Stephenses’ experts failed to show, however,
that the “any exposure” theory is generally accepted in the scientific
community—that any exposure to a product that contains asbestos results
in a statistically significant increase in the risk of developing
mesothelioma.  Each of the experts acknowledged at trial that mesothelioma, like
asbestosis, is dose responsive—some non de minimus occupational exposure must
occur to increase one’s risk of developing the disease.  Although the lay
testimony presented at trial is sufficient to show that Fred worked in close
proximity to asbestos-containing joint compound generally, it is legally
insufficient to show that Fred frequently and regularly worked in close
proximity to Georgia-Pacific joint compound so as to be exposed to
enough of its asbestos to increase his risk of developing mesothelioma.  The record
does not contain any quantitative estimate of Fred’s exposure to
Georgia-Pacific’s joint compound, as the Stephenses’ experts conceded.[11]  Moreover, although the literature and
scientific studies the Stephenses’ experts relied upon support a reasonable
inference that exposure to chrysotile asbestos can increase a worker’s risk of
developing mesothelioma, none of the studies undertake the task of linking the
minimum exposure level (or dosage) of joint compound with a statistically
increased risk of developing of the disease.  The experts in this case, which
was tried before the Borg-Warner decision, instead relied upon the “any
exposure” theory of causation that the Texas Supreme Court has rejected.[12]  Without quantitative evidence of exposure and
any scientific evidence of the minimum exposure level leading to an increased
risk of development of mesothelioma, we hold that the opinions offered by the
Stephenses’ experts in this case lack the factual and scientific foundation
required by Borg-Warner and thus are legally insufficient to support the
jury’s causation finding.

IV. CONCLUSION

          Applying the Texas Supreme
Court’s test in Borg-Warner for specific causation in asbestos cases, we
conclude that the expert testimony regarding causation presented at trial is
legally insufficient proof of substantial-factor causation necessary to support
the jury’s negligence and strict liability marketing defect verdicts against
Georgia-Pacific.  We therefore reverse and render.

 

                                                                    Jane Bland

                                                                    Justice

 

Panel consists of Justices Alcala,
Hanks, and Bland.









[1] See E.I. du Pont de Nemours & Co. v. Robinson, 923 S.W.2d 549, 558 (Tex. 1995).





[2] We note that courts in every circuit but the D.C.,
First, and Second, as well as courts in several states, including Arkansas,
Illinois, Maryland, Massachusetts, Michigan, Mississippi, Nebraska, New Jersey,
Oklahoma, Pennsylvania, and Washington, have adopted the
frequency-regularity-proximity test.





[3] Lauderdale relied on the literature admitted as
plaintiffs’ exhibits 43, 566–68, and 635–38.  Georgia-Pacific objected to the
introduction of the literature, contending among other grounds that none of it
linked asbestos-containing joint compound with mesothelioma.  The trial court
overruled the objections and admitted the literature into evidence.





[4] The Stephenses also called Dr. Barry Castleman, who
testified in Borg-Warner as an expert as to “what is in the public
domain in medical literature.”  See Borg-Warner Corp. v. Flores, No.
05-0189, 2007 WL 1650574, at *2 (Tex. June 8, 2007).  Dr. Castleman did not
testify in this case about causation.  He stated, however, that at the time of
trial, there had not been studies done to determine whether a link exists
between exposure to joint compound and mesothelioma.





[5] Pole sanding involves the use of a five-foot pole
with a steel plate to which a piece of sandpaper is attached.

 





[6] Jerry Lauderdale, the Stephenses’ industrial hygiene
expert, testified in detail about OSHA’s threshold limit values (“TLVs”) for
asbestos exposure.  He explained that OSHA implemented both a “time-weighted
average” TLV and a “short-term exposure” TLV.  The time-weighted average TLV
takes into account a worker’s asbestos exposure over the course of an entire
eight-hour work day, whereas the short-term exposure TLV measures the number of
asbestos fibers to which a worker is exposed when undertaking a single activity
(e.g., mixing or pole sanding), even though that activity might last only a few
minutes.  In 1971, OSHA imposed a time-weighted average TLV of twelve fibers per
cubic centimeter.  A year later, it reduced the time-weighted average TLV to
five fibers per cubic centimeter and imposed a new short-term exposure TLV of
ten fibers per cubic centimeter.  In 1976, OSHA further reduced the
time-weighted average TLV to two fibers per cubic centimeter, but retained the
short-term exposure TLV of ten fibers per cubic centimeter.  Ten years later,
OSHA reduced the overall TLV to 0.2 fibers per cubic centimeter, and then to
0.1 fibers per cubic centimeter in 1994.

 





[7] “Taping” refers to the application of joint compound.






[8] None of the Stephenses’ experts discussed the
mortality study in detail, and no one explained how PMR relates to relative
risk.  After reviewing the study, however, it is our understanding that PMR and
relative risk are synonymous.

 





[9] The relative risk value is important because the Havner
court held that “there is a rational basis for relating the requirement that
there be more than a ‘doubling of the risk’ [i.e., a relative risk of 2.0] to our
no evidence standard of review and to the more likely than not burden of
proof.”  953 S.W.2d 706, 717 (Tex. 1997).  Although the court expressly refused
to decide whether “epidemiological studies with relative risks of less than 2.0
might suffice if there were other evidence of causation,” it rejected many of
the Havners’ studies on the grounds that the relative risk did not exceed 2.0
and/or the results were not statistically significant.  See, e.g., id.
at 719, 725 (“One study . . . had a relative risk of 1.18 and a confidence
interval of 0.65 to 2.13.  However, the relative risk would need to exceed 2.0,
and the confidence interval could not include 1.0, for the results to indicate
more than a doubling of the risk and a statistically significant association
between Bendectin and limb reduction birth defects.”).

 





[10] The Havner court rejected similar “data
reanalysis” that did not identify a significance level or confidence interval. 
See, e.g., id. at 726 (“There is no explanation [in the data
reanalysis] . . . of the significance level used to obtain the 2.8 [relative
risk] result.  The result may well be statistically inconclusive at a 95%
confidence level.  We simply do not know from this record.  Without knowing the
significance level or the confidence interval, there is no scientifically
reliable basis for saying that the 2.8 result is an indication of anything.”).





[11] Fred answered affirmatively at trial that
Georgia-Pacific joint compound was used on a “substantial” number of jobs. 
But, as Lauderdale conceded, none of the lay witnesses attempted to provide a
quantitative estimate regarding usage of Georgia-Pacific joint compound.





[12] This is not to suggest that the levels of exposure
evidenced in this case could never be proved to increase the risk of developing
mesothelioma.  In Borg-Warner, the supreme court notes a treatise that
links mesothelioma with “low levels of asbestos exposure.”  2007 WL 1650574, at
*5.  Here, however, the experts and studies upon which they relied did not
attempt to correlate low exposures with increased risk, but used instead an “any
exposure” test.  If “any exposure” leads to an increased risk of mesothelioma,
then the testimony in this case proved that Fred was sufficiently exposed.  The
studies admitted in this trial record, however, do not link “any exposure” to
asbestos with an increase in the risk of developing mesothelioma.